UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————

KATINA SHERRILLS,

        Plaintiff,

v.

LISA BEISON, FLOYD WILSON, JR.,
PATRICIA KIMMEL, SPECTRUM
HEALTH WORTH SERVICES,
SPECTRUM HEALTH – KENT
COMMUNITY CAMPUS,

        Defendants.
_____/

Case No. 1:05-cv-310

Hon. Richard Alan Enslen

**OPINION**

    This matter is before the Court on the Defendants Lisa Beison, Floyd Wilson, Jr., Patricia Kimmel, Spectrum Health Worth Services, and Spectrum Health–Kent Community Campus' Motion for Summary Judgment. The Motion, having been fully briefed and oral arguments being unnecessary in light of the briefing, will be granted for the reasons explained below.

**BACKGROUND**

    This suit was originally filed *pro se* by Complaint of April 29, 2005. Later, counsel appeared on the behalf of Plaintiff. (Appearance of Nov. 17, 2005.) With the assistance of counsel, many of the original claims were dismissed by Order of May 25, 2006. (Dkt. No. 157.) The remaining claims allege that Plaintiff Katina Sherrills was discriminated against because of her race by her employer and the Individual Defendants in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964[1] (42 U.S.C. §§ 2000e *et seq.*), and Michigan's Elliott-Larson Civil Rights Act

---

[1] The Title VII claims, given the previous dismissal order, are now only against the employer and KCC, and not the Individual Defendants.

(Mich. Comp. Laws §§ 37.2101 *et seq.*). Plaintiff has also alleged retaliation in violation of Title VII.

Given the provisions of Federal Rule of Civil Procedure 56, the Court now interprets the factual record in a light most favorable to Plaintiff. Defendant Spectrum Health Worth Services ("Worth") is a non-profit organization that provides in-home care to adults and children with neuro-trauma, including brain injuries, throughout West Michigan. (Wilson Decl. ¶ 3.) Plaintiff, an African-American, was hired by Worth in 1998 as a Competency Evaluated Nurse Aide ("CENA"). Plaintiff, thereafter, voluntarily quit her employment with Worth. (Sherrills Dep. 84.)

Plaintiff again applied to work for Worth as a CENA in April 2002. (Kimmel Dep. Ex. 16.) Plaintiff's application admitted that she had a criminal history and described her convictions (*i.e.*, a 1995 conviction for retail fraud and a 1994 conviction for welfare fraud). (*Id.*) Notwithstanding the history, Defendant Patricia Kimmel (Worth's Grand Rapids branch manager) again offered Plaintiff the CENA position. (Pl. Dep. 94-95; Kimmel Dep. 86.)

Plaintiff began work on May 10, 2002, the same day that Public Act 303 of 2002 became effective. *See* Mich. Comp. Laws §§ 333.20173 *et seq.* (West 2006).[2] This Act placed restrictions on the employment of nursing aides with criminal records as to certain covered facilities. Under the Act, Spectrum Health-Kent Community Campus ("KCC') (a nursing home type facility) was a covered facility, but home health care was not covered under the Act. The Act contained a "grandfather clause," which excepted employed health care workers from the criminal background exclusion. *See* Mich. Comp. Laws § 333.20173(2). However, this clause was vague as to whether

---

[2]This Act was amended and re-codified on April 1, 2006 as Mich. Comp. Laws § 333.20173a.

it applied only to employees employed by the employer prior to the effective date of the Act, or applied more generally to health care workers with a health care work history prior to the effective date of the Act.

Beginning in 2004, Plaintiff questioned why she was not permitted to work at KCC, since she was scheduled shifts at Spectrum Health Continuing Care Center ("CCC"), another "covered facility" under the Act. (Pl. Dep at 182-84.) Lisa Beison, Worth's human resources assistant, reviewed this situation and concluded that Plaintiff should not be assigned shifts at either KCC or CCC. (Beison Dep. 94-96.) Beison then raised the issue with her supervisor, Floyd Wilson Jr. (an African-American). (*Id.* 107-08.) Wilson and Beison consulted legal counsel. (*Id.*) In June 2004, Worth temporarily stopped scheduling Plaintiff from working at CCC as well as KCC. (Pl. Dep. 183.) At that time, it was explained that the scheduling was solely because of the felony record status. (Beison Dep. Ex. 36.)

Plaintiff then obtained private counsel to challenge this interpretation of the Act. Her counsel later acknowledged in a legal article, that Defendants' interpretation of the Act was based on a desire to avoid possible liability under the vague statute. (Miriam Aukerman Dep. Ex. 82 at 2.) Plaintiff's counsel was, however, successful in both petitioning a state court to reduce the felony conviction status to a misdemeanor status, and also obtaining a legal ruling that the grandfather clause applied to Plaintiff. While Plaintiff was seeking this relief, Worth agreed to pay Plaintiff the hourly rate for facility work, which was more than the normal hourly rate for home care work, for up to 90 days while Plaintiff sought relief. (Pl. Dep. 237.) During these 90 days, the exclusion did not affect Plaintiff's earnings. (*Id.* at 244.) After Plaintiff obtained relief, Plaintiff began working

shifts at CCC. (*Id.* at 256.) She was also offered other shifts at the covered facilities, which she was unwilling to work. (Gibson Dep. 32; Wilson, Dep. Ex. 41 at DEF 0171-72.)

More recently, Plaintiff has interpreted her claims in this suit as applying not only to the facility scheduling, but other scheduling as well. Consistent with Worth's usual procedures, during Plaintiff's orientation, she completed a Scheduler Information form indicating her assignment, shift, day and travel preferences. (Nyp Dep. 143 & Ex. 1; Kimmel Dep 52-59.) Plaintiff indicated that she was willing to work in both nursing facilities or patients' homes on first or second shift during any day of the week, but that she did not wish to travel more than 15 miles. (Nyp Dep. 142-44 & Ex. 1.) Plaintiff later, in 2003, expressed that she no longer wanted to work Saturdays. (Pl. Dep 50.)

Thereafter, Plaintiff was scheduled shifts by Worth's schedulers. Though Kimmel would assist in scheduling on rare occasions, this work was almost always performed by the schedulers themselves. (Kimmel Dep. 65–66.) The schedulers assigned shifts based on a variety of factors including: caregiver skills (Nyp Dep. 124; Pacic Dep. 40); caregiver interest toward a client (Nyp Dep. 122); caregiver availability (Harris Dep. 106–07; Kimmel Dep 52; Pacic Dep. 39); caregiver response to scheduling calls (Pacic Dep. 39); caregiver shift preferences (Kimmel Dep. 57–58; Pacic Dep. 39); patient needs (Nyp Dep. 124); caregiver home environment preferences regarding pets and smoking (Pacic Dep. 59); patient history with the caregiver (*Id.* at 57); geographical proximity to the client (Nyp Dep. 122; Pacic Dep. 54–55); and, avoidance of overtime (Nyp Dep. 122; Pacic Dep. 43).

Scheduling by Worth was done independently by several schedulers. Plaintiff has claimed that Anna Stroh, Brittany Thompson, and Joie Zwiefka were given more hours and better shifts as compared to her assignments. (Pl. Dep. Ex. 52 at 4–5.) Anna Stroh, however, was employed as a

4

home health aide ("HHA") rather than a CENA. (Kimmel Decl. ¶ 6; Harris Decl. ¶ 4.) As such, she was less skilled, was paid less, and schedulers would typically prefer HHAs, when appropriate care could be provided, for the legitimate business reason of reducing staffing costs. (*Id.*) Brittany Thompson's scheduling likewise does not suggest discriminatory treatment, both because she was an HHA (different position than Plaintiff) and because she is of the same race as Plaintiff--African-American. (Kimmel Decl. ¶ 7; Pl. Dep. 164-65.) Joie Zwiefka did work as a CENA, but had more seniority than Plaintiff. Thus, on Plaintiff's theory, Joie Zwiefka was entitled to better shifts. Even so, Plaintiff has failed to identify with respect to Joie Zwiefka how she was scheduled more preferably than African-Americans. (Pl. Dep. 175.) Plaintiff does complain that Joie Zwiefka dressed and acted inappropriately at work. However, Joie Zwiefka was in fact discharged by the employer for inappropriate behavior in April 2004. Furthermore, the time records for the pertinent time periods do not suggest that Plaintiff was underemployed by the employer given that she averaged more than 40 hours per week and placed certain restrictions on her own shift assignments. (Kimmel Decl. Ex. 1, payroll records.)

Plaintiff also claims that she was subjected to discrimination regarding the treatment of another employee, who was tardy to work, causing Plaintiff to work a long shift. On December 13, 2003, Michelle Mencarelli was two hours late in relieving Plaintiff. (Kimmel Dep. 104.) According to Plaintiff, Mencarelli refused to call into the scheduler to assume responsibility for the patient. The net result was that Mencarelli was sent home and another worker replaced Plaintiff. Mencarelli was later disciplined for her tardiness. (*Id.* at 121.) Plaintiff met with Kimmel and Julia Harris (Kimmel's supervisor) to discuss the matter. Plaintiff was not disciplined in connection with this incident; Plaintiff also received extra pay for working the extra time. (Pl. Dep. Ex. 52 at 9.)

5

Nevertheless, Plaintiff was not satisfied with the rhetoric of that meeting because she believed that Kimmel believed Mencarelli's version of events. (Kimmel Dep. 131-32, 134.)

Plaintiff has cited two examples of what she believes is Kimmel's discrimination against African-Americans. One example is an e-mail which Kimmel forwarded in April 2002. (Pl. Resp. Ex. 7.) The content of the e-mail was purportedly prepared by comedian George Carlin and includes numerous politically-incorrect aphorisms about society and politics, including race. (*Id.*) Kimmel was in fact disciplined for sending the e-mail because it violated Worth's professional workplace standards. (Kimmel Dep. 33–34.) At the same time, though, Plaintiff admits that she was never subjected to racial slurs or intimidation at work. (Pl. Dep. 276–77.) The other incident did not involve Plaintiff, but a coworker, Richelle Smith. According to Smith, a scheduler made a racial slur about African-Americans while telling a joke in her presence. (Smith Dep. 65–72.) Smith complained about the incident to Kimmel, but she did not know how Kimmel resolved the complaint. (*Id.*)

## **LEGAL STANDARDS**

Defendants' Motion is brought pursuant to Federal Rule of Civil Procedure 56. Under the language of Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which

a reasonable jury could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions. *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Celotex Corp.*, 477 U.S. at 323 (quoting *Anderson*, 477 U.S. at 255). The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) (quoting Federal Rule of Civil Procedure 56(c)). Moreover, affidavits must meet certain requirements:

> [A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed. R. Civ. P. 56(e). The Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993). Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *id.*, unsworn statements, *Dole v. Elliot Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991), inadmissible expert testimony, *North Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280 (6th Cir. 1997), or hearsay

evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994).

## LEGAL ANALYSIS

The various versions of Plaintiff's Complaint were drafted *pro se.* Nevertheless, it does not appear that this is a diversity suit because diversity jurisdiction is not pled and in all likelihood does not exist.[3] As such, the Court will address first the federal law claims asserted premised on jurisdiction under 28 U.S.C. § 1331 before discussing the supplemental state law claims premised on jurisdiction under 28 U.S.C. § 1367.

**1. Federal Law Claims**

Plaintiff's federal discrimination claims are asserted pursuant to 42 U.S.C. § 1981 and Title VII and require proof of four elements to establish a *prima facie* case: (1) Plaintiff is a member of a protected class; (2) Plaintiff was subject to an adverse employment action; (3) Plaintiff was qualified for the job; and (4) for the same or similar conduct, Plaintiff was treated differently than similarly situated non-minority employees. *Noble v. Brinker Int'l., Inc.*, 391 F.3d 715, 728 (6th Cir. 2004). *See also Wright v. Murray Guard, Inc.,* 455 F.3d 702, 714 (6th Cir. 2006) (applying like standards to section 1981 and Title VII claims). If a *prima facie* case of discrimination is proven, the burden shifts to the employer to show a non-discriminatory basis for the action. If there is proof of a legitimate basis for the decision, then the employee must prove that the basis given is a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). Further, under the

---

[3]The various versions of the Complaint do not state the citizenship of the parties, but since both Plaintiff and the Individual Defendants were apparently working and living in Michigan at the time, there is no reason to assume a complete diversity of citizenship. *See Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996).

Sixth Circuit Court of Appeals' version of the "honest belief rule," so long as the employer honestly believes a proffered legitimate reason for an adverse action based upon rational and particularized facts at the time of the decision, then such reliance is justified provided that there is not proof to the contrary which would warrant an inference of unlawful discrimination. *Smith v. Chrysler Candorp.,* 155 F.3d 799, 807 (6th Cir. 1998); *Wright*, 455 F.3d at 708.

Plaintiff's claims for retaliation require proof of the elements to show a *prima facie* case: (1) Plaintiff was engaged in an activity protected under Title VII (such as making a complaint regarding discrimination); (2) Plaintiff suffered an adverse employment action, and (3) that there is a causal link between the two. *E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541, 543 (6th Cir. 1993). This claim is also subject to a good-faith justification defense. *Balmer v. HCA, Inc.,* 423 F.3d 606, 614 (6th Cir. 2005) (applying *Smith* rule to Title VII retaliation case); *see also Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 793 (6th Cir. 2000).

In this case, all of Plaintiff's claims fail for the reasons argued by Defendants. The alleged scheduling discrimination, inasmuch as it concerned the KCC[4] and CCC facilities, was done for a legitimate non-discriminatory reason– the employer's interpretation of a new and vague statute. The other scheduling complained about was either not as to "similarly situated" persons (most of the other health aides were not CENAs), was not adverse to Plaintiff, or was based upon legitimate, non-discriminatory and non-retaliatory reasons, *i.e.*, the employers desire to save staffing costs and/or other legitimate scheduling factors. As to the Mencarelli incident, there has been no showing of an adverse action affecting Plaintiff. Likewise, the various conduct of the Individual Defendants does

---

[4] To the extent that Plaintiff is suing KCC for failing to hire her, this claim fails both because the claim has been waived in the briefing (*see* Defs.' Reply 19), and because KCC acted for a legitimate non-discriminatory reason (its interpretation of the statute).

not constitute unlawful discrimination and retaliation as a matter of law. Kimmel and the other Individual Defendants did not take any negative employment actions toward Plaintiff( except for the non-assignment to KCC or CCC, which was otherwise based solely on a legal interpretation of a new and vague statute). In short, there is nothing to support a claim of statutory discrimination or retaliation under any federal statute.[5]

**2. State Law Claims**

Title 28 U.S.C. § 1367(c)(3) authorizes the dismissal of supplemental state law claims, upon dismissal of federal law claims. In this case, Plaintiff has brought various state law claims, including claims under the Michigan Elliot Larsen Civil Rights Act. The supplemental jurisdiction statute is intended to preserve comity between the state and federal courts, which is a traditional aspect of our federal system. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). Upon due consideration of the interests of the state courts in resolving state law controversies, the Court determines in its discretion that it should decline to exercise jurisdiction over the remaining state law claims. As such, those claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

[5]Plaintiff also cites two examples of supposedly direct evidence of unlawful discrimination. These examples are not supported by admissible evidence, and are otherwise irrelevant. The e-mail incident was both remote in time and involved such isolated and ambiguous comments such that it cannot constitute direct evidence of discrimination. *See Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993). The Richelle Smith incident is even more attenuated, and nothing other than speculation and inadmissible hearsay supports that Kimmel's response to the situation was inappropriate.

For the reasons given in this Opinion, Judgment shall enter granting Defendants' Motion for Summary Judgment, dismissing all federal law claims with prejudice, and dismissing all state law claims without prejudice.

Dated in Kalamazoo, MI:  　　　　　　　　　　　　/s/Richard Alan Enslen
September 19, 2006　　　　　　　　　　　　　　Richard Alan Enslen
　　　　　　　　　　　　　　　　　　　　　　　Senior United States District Judge